James E. SWANN et al., Plaintiffs,

v.

The CHARLOTTE–MECKLENBURG
BOARD OF EDUCATION et al.,
Defendants.

Civ. A. No. 1974.

United States District Court
W. D. North Carolina,
Charlotte Division.

Nov. 7, 1969.

Supplementary Opinion and Order
Dec. 1, 1969.

J. Levonne Chambers and Adam Stein, Charlotte, N. C., for plaintiffs.

Brock Barkley, William J. Waggoner, Weinstein, Waggoner, Sturges & Odom, and Benjamin S. Horack, Ervin, Horack & McCartha, Charlotte, N. C., for defendants.

## ORDER

McMILLAN, District Judge.

On October 29, 1969, the United States Supreme Court announced its decision in the Mississippi school case, Alexander v. Holmes County, 396 U.S. 19, 90 S.Ct.

29, 24 L.Ed.2d 19. That decision, the most significant in this field since Brown v. Board of Education, 419 F.2d 1211 peremptorily reversed an order of the Fifth Circuit Court of Appeals which, upon request of the United States Attorney General, had postponed until 1970 the effective desegregation of thirty Mississippi school districts, and had extended from August 11 to December 1, 1969, their deadline for filing desegregation plans. The Supreme Court held that the Court of Appeals

" * * * *should have denied all motions for additional time* because continued operation of *segregated schools* under a standard of allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible. *Under explicit holdings of this Court, the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools.* Griffin v. County School Board, 377 U.S. 218, 234, 84 S.Ct. 1226, 1235, 12 L.Ed.2d 256 (1964); Green v. County School Board of New Kent County, 391 U.S. 430, 439, 442, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)." (Emphasis added.)

The Supreme Court further directed the Fifth Circuit Court of Appeals to make such orders as might be necessary for the *immediate* start in each district of the operation of a "totally unitary school system for all eligible pupils without regard to race or color."

■ It is this court's opinion that the word "dual" in the Supreme Court opinion is another word for "segregated," and that "unitary" is another word for "desegregated" or "integrated." It is also this court's opinion that although, as defendants say, this is not Mississippi, nevertheless the Supreme Court's prohibition against extension of time as laid down in Alexander v. Holmes County is binding upon this court and this School Board, and bars the exercise of the court's usual discretion in such matters, and that to allow the request of the de-

fendants for extension of time to comply with this court's previous judgments would be contrary to the Supreme Court's decision and should not be done.

Therefore, and based also upon the considerations set out in the memorandum opinion to be filed contemporaneously herewith, the motion of the defendants for extension of time for compliance with the court's August 15, 1969 order is denied. Ruling on all other pending motions is deferred.

## MEMORANDUM OPINION
## PRELIMINARY STATEMENT

On Wednesday, October 29, 1969, the United States Supreme Court announced its decision in the Mississippi school case (Alexander v. Holmes County, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19). That decision peremptorily reversed an order of the Fifth Circuit Court of Appeals which, upon request of the United States Attorney General, had postponed until 1970 the effective desegregation of thirty Mississippi schol districts, and had extended from August 11 to December 1, 1969, their deadline for filing desegregation plans. The Supreme Court held that the Court of Appeals

" * * * *should have denied all motions for additional time* because continued operation of *segregated schools* under a standard of allowing all deliberate speed for desegregation is no longer constitutionally permissible. *Under explicit holdings of this Court, the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools.* Griffin v. County School Board, 377 U.S. 218, 234, 84 S.Ct. 1226, 1235, 12 L.Ed.2d 256 (1964); Green v. County School Board of New Kent County, 391 U.S. 430, 439, 442, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)." (Emphasis added.)

The Supreme Court further directed the Fifth Circuit Court of Appeals to make such orders as might be necessary for the *immediate* start in each district of

the operation of a "totally unitary school system for all eligible pupils without regard to race or color."

The Mississippi school districts in the *Holmes County* case had degrees of desegregation ranging from nearly zero to about 16% of the Negro pupils. They like Mecklenburg hoped that their "freedom of choice" plans would satisfy the Constitution.

The request for time extension, and all later proceedings in this cause, must be considered in light of the Supreme Court's reaffirmation of the law which this court has been following, and in light of the urgency now required by the *Holmes County* decision.

## THE RESULTS OF THE 1969 PLAN

For pupil desegregation, the July 29, 1969 plan proposed to close seven black inner-city schools (most or all of which had previously been ear-marked for eventual "phase-out") and to transfer their 3,000 students in specified numbers to named suburban schools. All the transferee schools except West Charlotte were white. In addition, 1,245 black students, in specified numbers, were to be transferred from eight black or largely black schools to other designated suburban white schools.

The plan was accepted and approved because of its apparent promise to extend the opportunities of a desegregated education to over 4,000 new black students.

The plan has not been carried out as advertised: (a) Only 73 of the 1,245 scheduled for transfer from overcrowded black schools have been so transferred; those 73 were transferred not to the schools designated, but to other schools not mentioned in the plan. (b) It is now revealed that the closed schools, which were billed in July to produce 3,000 black students for transfer, actually had only 2,627 students in them when the schools closed in June! (c) The Board allowed full freedom of choice for students from the closed schools, and those students in large numbers elected to go to Harding High School, and to Williams Junior High, Northwest Junior High and other black schools, instead of to the assigned white schools. As a result, Harding High School was transformed immediately from 17% black to 47% black. This produced community consternation but no racial disorder among the students. The result may be deplorable, but the fact that the students at Harding High School have adjusted peaceably to the situation (like others before them at Cornelius, Davidson, Olympic, Randolph Road, Hawthorne and Elizabeth, and like the people of Anson and other North Carolina counties) shows that Mecklenburgers can live with desegregated schools. (d) The transfers proposed simply appear never to have been made to most of the suburban schools named in the plan. (e) *The plan therefore transferred to white schools only 1,315 instead of the promised 4,245 black pupils!* From closed schools, the elementary transferees numbered 463 instead of the advertised 1,235; junior high transferees were 273 instead of 630; and senior high transferees were 506 instead of 1,135; and from overcrowded schools 73 instead of 1,245. If Harding (47% black, 630 Negro students), Olympic (42% black, 376 Negro students), and Wilmore (49% black, 228 Negro students) should be allowed to continue their rapid shift from white to black, the net result of the 1969 pupil plan would be nearly zero.

Faculty desegregation has significantly and commendably improved since the April 27 order. Nevertheless, only six "black" schools and one "black" kindergarten have predominantly white faculties; and 98 out of the 106 schools and kindergartens in the system are today readily and obviously identifiable by the race of the heavy majority of their faculties.

The "performance gap" is wide.

## THE SITUATION TODAY

The following table illustrates the racial distribution of the present school population:

### SCHOOLS READILY IDENTIFIABLE AS WHITE

| % WHITE | NUMBER OF SCHOOLS | NUMBERS OF STUDENTS | | |
| --- | --- | --- | --- | --- |
| | | WHITE | BLACK | TOTALS |
| 100% | 9 | 6,605 | 2 | 6,607 |
| 98–99% | 9 | 4,801 | 49 | 4,850 |
| 95–97% | 12 | 10,836 | 505 | 11,341 |
| 90–94% | 17 | 14,070 | 1,243 | 15,313 |
| 86–89% | 10 | 8,700 | 1,169 | 9,869 |
| | 57 | 45,012 | 2,968 | 47,980 |

### SCHOOLS READILY IDENTIFIABLE AS BLACK

| % BLACK | NUMBER OF SCHOOLS | NUMBERS OF STUDENTS | | |
| --- | --- | --- | --- | --- |
| | | WHITE | BLACK | TOTALS |
| 100% | 11 | 2 | 9,216 | 9,218 |
| 98–99% | 5 | 41 | 3,432 | 3,473 |
| 90–97% | 3 | 121 | 1,297 | 1,418 |
| 56–89% | 6 | 989 | 2,252 | 3,241 |
| | 25 | 1,153 | 16,197 | 17,350 |

### SCHOOLS NOT READILY IDENTIFIABLE BY RACE

| % BLACK | NUMBER OF SCHOOLS | NUMBERS OF STUDENTS | | |
| --- | --- | --- | --- | --- |
| | | WHITE | BLACK | TOTALS |
| 32–49% | 10 | 4,320 | 2,868 | 7,188 |
| 17–20% | 8 | 5,363 | 1,230 | 6,593 |
| 22–29% | 6 | 3,980 | 1,451 | 5,431 |
| | 24 | 13,663 | 5,549 | 19,212 |
| TOTALS: | 106 | 59,828 | 24,714 | 84,542 |

Some of the data from the table, re-stated, is as follows:

| | |
| --- | --- |
| Number of schools | 106 |
| Number of white pupils | 59,828 |
| Number of black pupils | 24,714 |
| Total pupils | 84,542 |
| Per cent of white pupils | 71% |
| Per cent of black pupils | 29% |
| Number of "white" schools | 57 |
| Number of white pupils in those schools | 45,012 |
| Number of "black" schools | 25 |
| Number of black pupils in those schools | 16,197 |
| Number of schools not readily identifiable by race | 24 |
| Number of pupils in those schools | 19,212 |

Number of schools 98–100% black ......................... 16
Negro pupils in those schools ........................... 12,648
Number of schools 98–100% white ........................ 18
White pupils in those schools .......................... 11,406

Of the 24,714 Negroes in the schools, something above 8,500 are attending "white" schools or schools not readily identifiable by race. More than 16,000, however, are obviously still in all-black or predominantly black schools. The 9,216 in 100% black situations are considerably more than the number of black students in Charlotte in 1954 at the time of the first *Brown* decision. The black school problem has not been solved.

The schools are still in major part segregated or "dual" rather than desegregated or "unitary."

The black schools are for the most part in black residential areas. However, that does not make their segregation constitutionally benign. In previous opinions the facts respecting their locations, their controlled size and their population have already been found. Briefly summarized, these facts are that the present location of white schools in white areas and of black schools in black areas is the result of a varied group of elements of public and private action, all deriving their basic strength originally from public law or state or local governmental action. These elements include among ·others the legal separation of the races in schools, school busses, public accomodations and housing; racial restrictions in deeds to land; zoning ordinances; city planning; urban renewal; location of public low rent housing; and the actions of the present School Board and others, before and since 1954, in locating and controlling the capacity of schools so that there would usually be black schools handy to black neighborhoods and white schools for white neighborhoods. There is so much state action embedded in and shaping these events that the resulting segregation is not innocent or *"de facto,"* and the resulting schools are not "unitary" or desegregated.

### FREEDOM OF CHOICE

Freedom of choice has tended to perpetuate segregation by allowing children to get out of schools where their race would be in a minority. The essential failure of the Board's 1969 pupil plan was in good measure due to freedom of choice.

As the court recalls the evidence, it shows that *no white students have ever chosen to attend any of the "black" schools.*

■ Freedom of choice does not make a segregated school system lawful. As the Supreme Court said in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1968):

" * * * If there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, 'freedom of choice' must be held unacceptable."

Redrawing attendance lines is not likely to accomplish anything stable toward obeying the constitutional mandate as long as freedom of choice or freedom of transfer is retained. The operation of these schools for the foreseeable future should not include freedom of choice or transfer except to the extent that it reduces segregation, although of course the Board under its statutory power of assignment can assign any pupil to any school for any lawful reason.

### THE "NATIONAL STANDINGS"

The defendants filed some statistics concerning the one hundred largest school systems in the country, and say

that Charlotte-Mecklenburg desegregation compares favorably with that in most of those systems. That may well be so. The court is not trying cases involving the other ninety-nine school boards, and has not studied any evidence about them and does not know their factual nor legal problems. The court in its first order of April 23, 1969 has noted the substantial desegregation achieved in certain areas in the Charlotte-Mecklenburg system, and is still aware of it. The fact that other communities might be more backward in observing the Constitution than Mecklenburg would hardly seem to support denial of constitutional rights to Mecklenburg citizens. The court doubts that a double standard exists. The Attorney General of the United States has filed suit for desegregation in Connecticut as well as in the whole State of Georgia. One of the most stringent desegregation orders on record was entered recently against a school board in the City of Chicago. Constitutional rights will not be denied here simply because they may be denied or delayed elsewhere. There is no "Dow-Jones average" for such rights. With all due deference to the complexities of this school system, which have already been fully noted in previous opinions, the Board and the community must still observe the Constitution. The fact that the school system ranks high in some artificial "national standings" or that one-third of the Negro students do attend desegregated schools or predominantly white schools is no answer to the constitutional problems presented by sixteen thousand black Mecklenburgers still going to all-black or largely black schools in this predominantly white community.

## THE PROSPECTS FOR THE FUTURE

The second part of the Board's report is answers to the court's questions designed to determine whether the Board has made the hard decisions necessary to desegregate the schools.

The answers show that those decisions have not been made.

The computer expert has been given restrictions which, taken at face value, indicate that his work will not lead to desegregation of all the schools. One such restriction has the apparent effect of limiting attendance to those who live a maximum of roughly a mile and a half from the school. (This is the requirement that all grids or areas must be "contiguous to the home grid or to grids which are contiguous to the home grid.") Another is the limitation that no school attended by whites should have less than a 60% white student population. (Unless this were coupled with a further requirement that no school attended by blacks shall have more than a 40% black student population, this appears to put the black schools "off limits" for his study. The original verified motion of the School Board contained two other limitations. Those were that "a 'desirable' racial balance should be obtained" and that "reasonable limitation on distance of travel for a child has been imposed." The record is silent on what these limitations mean and whether they are still in effect.

The Board has not accepted pairing and grouping and clustering of schools as legitimate techniques, but has simply indicated that it will "consider" those techniques where they offer "*reasonable* prospects of producing *stable* desegregation * * *." (Emphasis added.)

The report states unconditionally that:
"*The information supplied by the systems analysis approach will not produce desegregation of all schools by September, 1970.* Dramatic results are expected. It is *hoped* that the number of all white and all black schools will be substantially *reduced.* The number of such schools cannot be determined at this time." (Emphasis added.)

The report also says that:
"* * * *The Board of Education does not feel that it will be possible to produce pupil desegregation in each school by September, 1970.* It is expected that faculties will fairly repre-

sent a cross section of the total faculty so that most and *possibly* all schools will not have a racially identifiable faculty. Furthermore, the restructuring of attendance lines coupled with faculty desegregation *may* satisfy constitutional requirements." (Emphasis added.)

The School Board is sharply divided in the expressed views of its members. From the testimony of its members, and from the latest report, it cannot be concluded that a majority of its members have accepted the court's orders as representing the law which applies to the local schools. By the responses to the October 10 questions, the Board has indicated that its members do not accept the duty to desegregate the schools at any ascertainable time; and they have clearly indicated that they *intend not to do it* effective in the fall of 1970. They have also demonstrated a yawning gap between predictions and performance.

■ Withholding or delaying the constitutional rights of children to equal educational opportunity on such vague terms as these is not the province of the School Board nor of this court.

Furthermore, since the Supreme Court has now prohibited lower courts from granting extensions of time, it may well be that the gradual time table laid down by this court's April 23, 1969 order (contemplating substantial progress in 1969 and complete desegregation by September 1970) was and is too lenient.

If the plan tendered by the School Board on November 17, 1969 is thorough and informative, and sufficiently shows an unconditional purpose on the part of the Board to complete its job effective by September, 1970, the Board may perhaps be allowed to adhere to the existing time table. Certainly a Mecklenburg plan ought if possible to be prepared by the Mecklenburg School Board and its large and experienced staff, rather than by outside experts. Decision on that and other pending questions must await further developments, including the Board's November 17, 1969 report.

## CONCLUSIONS

The school system is still discriminatorily segregated by race and maintained that way by state action. In many ways it is not in compliance with the Constitution. The Board has not shown a valid basis for an extension of time to comply with the court's judgment; it has shown no intention to comply by any particular time with the constitutional mandate to desegregate the schools; and it has suggested its intention *not* to comply by September, 1970. In spite of those facts the court would like as a matter of discretion to grant some of the time extension requested, but is of the considered opinion that in Alexander v. Holmes County the Supreme Court has prohibited the exercise of such discretion. The findings of fact in this opinion will be considered, along with facts found in previous orders, opinions and memoranda, as the basis for such future judgments and orders as may be appropriate, including such judgments and orders as may be appropriate upon receipt of the Board's November 17, 1969 plan. All statements of fact in this memorandum opinion, whether or not labeled as such, shall be deemed findings of fact, as necessary to support such judgments and orders.

## SUPPLEMENTARY OPINION AND ORDER

### THE NOVEMBER 17 PLAN

On April 23, 300 F.Supp. 1358, June 20, 300 F.Supp. 1381 and August 15, 306 F.Supp. 1291, 1969, the defendant school board was ordered to file plans to desegregate the schools of Charlotte and Mecklenburg County, North Carolina. The defendants have admitted their duty to desegregate the schools; considerable progress has been made toward desegregation of faculties; and progress, previously noted has been made in some other areas. The schools, however, remain for the most part unlawfully segregated. The facts supporting that conclusion in all the court's previous orders are reiterated here.

The issue is what to do pursuant to the board's latest plan, filed November 17, 1969. The plan recites the following ostensible purpose:

"The Board of Education has embarked upon a comprehensive program for the purpose of restructuring attendance lines involving all schools and all students served by the system. The primary purpose of this program is to achieve further desegregation in as many schools as possible * * *."

The plan says that a computer analyst has been hired to draw up various *theoretical* possible school zone attendance lines, and that school personnel, before February 1, 1970, will draw the *actual* lines.

The details of the plan show that it contains no promise nor likelihood of desegregating the schools.

The plan and the report accompanying it say (emphasis added):

"No school district *to which white students are assigned* should have less than 60 per cent white student population to avoid 'tipping.'" (Plan, page 2.)

\* \* \* \* \* \*

* * * it is the plan of this School Board to limit schools *to which white students are assigned* to those schools in which it is possible to provide a student population which is at least 60 per cent white." (Plan, page 5.)

\* \* \* \* \* \*

"In determining the initial attendance lines, the ratio of black to white students will not exceed 60% white—40% black *WHERE THE SCHOOL IS DESEGREGATED.*" (Report, page 5.)

\* \* \* \* \* \*

"*A majority of the Board of Education believes that the constitutional requirements of desegregation will be achieved by the restructuring of attendance lines, the restricting freedom of transfer, and other provisions of this plan. The majority of the Board has, therefore, discarded further consideration of pairing, grouping, clus-*tering and transporting." (Plan, page 6.)

The strongest claim made in the plan with respect to the all-black schools is that among 43 elementary schools in the densely populated areas of Charlotte it is *"theoretically* [school board's emphasis] possible to populate these schools with the following ratios of black students: * * * Seven (7) schools in which the black student population is 100 per cent." (Plan, pages 3 and 4.) Since the 100% black elementary schools in the system (Billingsville, Marie Davis, Double Oaks, First Ward, Lincoln Heights, Oaklawn and University Park) number exactly seven, this language obviously proposes that these seven schools will remain all-black.

The plan contains no factual information nor estimate regarding plans for desegregation of the 31 other elementary schools, the 20 junior high schools, and the 10 senior high schools in the system.

Concerning faculty desegregation the plan says:

"*During* the 1970–71 school year, the Board of Education will staff each school so that the faculty at each school will be *predominantly* white and, *where practicable* will reflect the ratio of white and black teachers employed in the total faculty of the school system." (Plan, page 7.)

With regard to the physical facilities, the court on August 15, 1969, ordered the defendants to produce by November 17 "A detailed report showing, complete with figures and maps, the location and nature of each construction project proposed or under way, and the effect this project may reasonably be expected to have upon the program of desegregating the schools." In response to that order, the plan lists the names of 21 out of 91 projects, expresses a few opinions and conclusions about the building program, and promises a partial study by February 1, 1970 and a "general long range study" "*by June of 1970,*" but it sheds no factual light on the effect of any part of the building program on the

segregation issue. Since the board has, in seven months, failed to produce a program for desegregation, it is only natural that they can not predict the effect of any particular building project on such a program. The court has yet not received information necessary to appraise the effects of current building activity on the current unprogrammed course of desegregation.

When the plan is understood, it boils down to this:

1. It proposes to re-draw school zone lines, and to restrict freedom of choice, which the court had already advised the board to eliminate except where it would promote desegregation. It states no definable desegregation goals.

2. The "60–40" ratio is a one-way street. The plan implies that there will be no action to produce desegregation in schools with black populations above 40%, *and that no white students are to be assigned to such schools*.

3. Continued operation of all seven of the all-black elementary schools would be assured. The same would appear to be true for the entire group of 25 mostly "black" schools, mentioned in the court's November 7 order, which serve 16,197 of the 24,714 black students in the system.

4. Transportation to aid children transferring out of segregated situations (which was ordered by the court on April 23 as a condition of any freedom of transfer plan, *and which was a part of this plan as advertised in the board's October 29 report*) has been eliminated from the plan as filed with the court. Inevitable effects of this action would be to violate the court order and to leave the children recently reassigned from seven closed black inner-city schools with no way to reach the suburban schools they now attend! This is *re*-segregation.

5. Other methods (pairing, grouping, clustering of schools) which could reduce or eliminate segregation—and which the board, on October 29 when it was asking for a time extension, promised to consider—have now been expressly left out of the plan.

6. No time is set to complete the job of faculty and pupil desegregation.

7. In the written argument ("Report") filed with the plan, with the candor characteristic of excellent attorneys, the board's attorneys say:

"It is important that the Court does not construe the information submitted in the plan relating to racial ratios of elementary schools as being in the nature of a guarantee by the Board since it is anticipated *the results of restructuring the attendance lines may produce a greater or lesser degree of desegregation, the extent of which cannot be determined at this time.*" (Report, page 4; emphasis added.)

The defendants have the burden to desegregate the schools and to show that any plan they propose will desegregate the schools. They have not carried that burden. Re-drawing school zone lines won't eliminate segregation unless the decision to desegregate has first been made.

### THE SCHOOLS ARE STILL SEGREGATED

The extent to which the schools are still segregated was illustrated by the information set out in previous orders including the order of November 7, 1969. Nearly 13,000 out of 24,714 black students still attend schools that are 98% to 100% black. Over 16,000 black students still attend predominantly black schools. Nine-tenths of the faculties are still obviously "black" or "white." Over 45,000 out of 59,000 white students still attend schools which are obviously "white."

### THE RESULT IS UNEQUAL EDUCATION

The following table further illustrates the results. Groups A and B show that sixth graders, in the seven 100% black schools the plan would retain, perform

at about fourth grade levels, while their counterparts in the nine 100% white elementary schools perform at fifth to seventh grade levels. Group C shows that sixth graders in Barringer, which changed in three years from 100% middle income white to 84% Negro, showed a performance drop of 1½ to 2 years. Group D shows however that Randolph Road, 72% white and 28% Negro, has eighth grade performance results approximately comparable to Eastway, which is 96% white, and Randolph results are approximately two years ahead of all-black Williams and Northwest. Until unlawful segregation is eliminated, it is idle to speculate whether some of this gap can be charged to racial differences or to "socio-economic-cultural" lag.

If the courts should accept the defendants' contention that all they have to do is re-draw attendance lines and allow a type of freedom of choice, two-thirds or more of the black children in Mecklenburg County would be relegated permanently to this kind of separate but _unequal_ education.

AVERAGE ACHIEVEMENT TEST SCORES, GRADE 6, REPORTED IN GRADE EQUIVALENT, 1965-66/1968-69

GROUP A - 100% Black Elementary

| | WM 1965-'66/1968-'69 | PM 1965-'66/1968-'69 | SP 1965-'66/1968-'69 | LANG 1965-'66/1968-'69 | ACM 1965-'66/1968-'69 | ACN 1965-'66/1968-'69 | AAPP 1965-'66/1968-'69 | SS 1965-'66/1968-'69 | SC 1965-'66/1968-'69 |
|---|---|---|---|---|---|---|---|---|---|
| Billingsville | 37/39 | 39/42 | 43/45 | 36/37 | 37/38 | 41/44 | 38/39 | 42/43 | 37/38 |
| Marie Davis | 42/43 | 42/44 | 49/48 | 39/41 | 43/45 | 45/48 | 43/41 | 43/45 | 39/40 |
| Double Oaks | 44/42 | 42/40 | 49/46 | 35/36 | 41/39 | 45/44 | 41/37 | 44/40 | 41/37 |
| First Ward | 43/40 | 42/41 | 50/48 | 39/36 | 40/39 | 44/46 | 43/41 | 48/44 | 42/40 |
| Lincoln Heights | 45/44 | 44/44 | 52/49 | 44/42 | 45/43 | 46/48 | 43/41 | 47/46 | 42/41 |
| Oaklawn | 44/44 | 42/45 | 50/53 | 42/47 | 41/45 | 50/49 | 43/44 | 41/49 | 40/47 |
| University Park | 44/44 | 44/47 | 51/48 | 43/43 | 40/44 | 46/48 | 41/44 | 46/46 | 41/43 |

GROUP B - 100% White Elementary

| | WM | PM | SP | LANG | ACM | ACN | AAPP | SS | SC |
|---|---|---|---|---|---|---|---|---|---|
| Devonshire | 52/59 | 54/62 | 57/60 | 57/64 | 49/53 | 53/63 | 55/59 | 57/64 | 57/65 |
| Hidden Valley | /59 | /62 | /61 | /62 | ·/51 | /60 | /59 | /64 | /67 |
| Merry Oaks | 62/60 | 66/66 | 66/67 | 66/71 | 53/54 | 59/65 | 67/64 | 70/68 | 73/72 |
| Montclaire | 66/67 | 68/72 | 69/70 | 71/76 | 58/60 | 61/67 | 66/68 | 70/71 | 76/77 |
| Pinewood | 67/64 | 68/68 | 71/68 | 71/71 | 58/61 | 62/67 | 68/71 | 72/71 | 73/70 |
| Rama Road | 68/67 | 68/72 | 70/71 | 73/76 | 58/61 | 64/67 | 70/70 | 72/73 | 76/78 |
| Shamrock Gardens | 59/56 | 61/57 | 66/57 | 64/62 | 52/53 | 58/57 | 63/57 | 65/61 | 62/61 |
| Thomasboro | 58/55 | 59/55 | 63/58 | 59/58 | 52/51 | 57/56 | 60/56 | 63/59 | 64/61 |
| Windsor Park | 61/64 | 63/68 | 61/66 | 65/69 | 55/53 | 59/63 | 63/62 | 65/69 | 67/72 |

GROUP C - Barringer

| | WM | PM | SP | LANG | ACM | ACN | AAPP | SS | SC |
|---|---|---|---|---|---|---|---|---|---|
| Barringer | 61*/46# | 63*/46# | 64*/50# | 66*/42# | 53*/45# | 59*/48# | 64*/44# | 65*/47# | 68*/45# |

*100% white in 1965
# 84% black in 1968-69

AVERAGE ACHIEVEMENT TEST SCORES, GRADE 8, REPORTED IN GRADE EQUIVALENT, 1965-66/1968-69

GROUP D - Junior High

| | PM 1965-'66/1968-'69 | SP 1965-'66/1968-'69 | LANG 1965-'66/1968-'69 | ACM 1965-'66/1968-'69 | ACN 1965-'66/1968-'69 | AAPP 1965-'66/1968-'69 | SS 1965-'66/1968-'69 | SC 1965-'66/1968-'69 |
|---|---|---|---|---|---|---|---|---|
| Randolph Road (28% black) | /80 | /82 | /79 | /62 | /79 | /76 | /79 | /81 |
| Williams (100% black) | 55/52 | 67/64 | 55/52 | 52/49 | 58/61 | 58/55 | 56/56 | 55/56 |
| Northwest (100% black) | 59/58 | 73/71 | 59/56 | 54/50 | 60/61 | 58/58 | 59/57 | 59/58 |
| Eastway (96% white) | 84/82 | 85/86 | 83/81 | 74/67 | 79/82 | 81/75 | 83/82 | 87/87 |

[A668]

---

## THE LAW STILL REQUIRES DESEGREGATION

Segregation in public schools was outlawed by the decisions of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

The first *Brown* opinion (*Brown I*) held that racial segregation, even though physical facilities and other tangible factors might be equal, deprives Negro children of equal educational opportunities. The Court recalled prior decisions that segregation of graduate students was unlawful because it restricted the student's "ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession." The Court said:

"Such considerations apply with added force to children in grade and high schools. To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone."

Quoting a lower court opinion, the Supreme Court continued:

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendence to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system.'
* * *
"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. *Separate educational facilities are inherently unequal.* * * *." (Emphasis added.)

* * * * * *

"* * * Such segregation has long been *a nationwide problem, not merely one of sectional concern.*" (Emphasis added.)

The selection of cases for the *Brown* decision demonstrates the nationwide reach of that concern; Brown lived in Kansas and the defendant board of education was that of Topeka, Kansas; defendants in companion cases included school authorities in Delaware and the District of Columbia. Later important cases have involved not just Southern schools, but also schools in New York, Chicago, Ohio, Denver, Oklahoma City, Kentucky, Connecticut, and other widely scattered places.

Court decisions setting out the principles upon which the various orders of this court have been based include the following:

## SUPREME COURT CASES

Alexander v. Holmes County (Mississippi), 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed. 2d 19 (October 29, 1969).

Brown v. Board of Education of Topeka (Kansas), 347 U.S. 483, 74 S.Ct. 686 (1954), 349 U.S. 294, 75 S.Ct. 753 (1955).

Cooper, Members of the Board of Directors of the Little Rock (Arkansas) Independent School District v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

Green v. County School Board of New Kent County (Virginia), 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

Griffin v. County School Board of Prince Edward County (Virginia), 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

Keyes v. Denver (Colorado) School District Number 1, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37, Application for Vacation of Stay (Justice Brennan, Supreme Court, August 29, 1969).

Monroe v. Board of Commissioners of the City of Jackson (Tennessee), 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

Raney v. Board of Education of the Gould School District (Arkansas), 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968).

United States v. Montgomery County (Alabama) Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).

## CIRCUIT COURT CASES

Brewer v. School Board of City of Norfolk (Virginia), 397 F.2d 37 (4th Cir., 1968).

Felder v. Harnett County (North Carolina) Board of Education, 409 F.2d 1070 (4th Cir., 1969).

Wanner v. County School Board of Arlington County (Virginia), 357 F.2d 452 (4th Cir., 1966).

Henry v. Clarksdale (Mississippi) Municipal Separate School District, 409 F.2d 682 (5th Cir., 1969) petition for cert. filed, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242 (9/2/69).

United States v. Greenwood (Mississippi) Municipal Separate School District, 406 F.2d 1086 (5th Cir., 1969) cert. denied, 395 U.S. 907, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969).

United States v. Hinds County School Board, 417 F.2d 852 (5th Cir., July 3, 1969).

Clemons v. Board of Education of Hillsboro, Ohio, 228 F.2d 853 (6th Cir., 1956) (cert. denied, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868).

United States v. School District 151 of Cook County, Illinois (Chicago), 404 F.2d 1125 (7th Cir., 1968) (rehearing denied, January 27, 1969).

## DISTRICT COURT CASES

Eaton v. New Hanover County (North Carolina) Board of Education, No. 1022 (E.D.N.C., July 14, 1969).

Keyes v. School District Number One, Denver (Colorado), 303 F.Supp. 289 (D.Colo., 1969).

Some of these principles which apply to the Charlotte-Mecklenburg situation are:

1. Racial segregation in public schools is unlawful, Brown I; Green v. County School Board of New Kent County, Virginia; Clemons v. Hillsboro, Ohio. Such segregation is unlawful even though not required nor authorized by state statute, Clemons v. Hillsboro. Acts of school boards perpetuating or restoring separation of the races in schools are *de jure*, unlawful discrimination, Cooper v. Aaron; Keyes v. Denver, Colorado School Board (August 14, 1969), approved by the Supreme Court of the United States two weeks later, Keyes v. Denver, U. S. Supreme Court, August 29, 1969.

2. Drawing school zone lines, like "freedom of transfer," is not an end in itself; and a plan of geographic zoning which perpetuates discriminatory segregation is unlawful, Keyes v. Denver; Brewer v. Norfolk; Clemons v. Hillsboro; Henry v. Clarksdale, Mississippi; United States v. Hinds County; United States v. Greenwood.

3. No procedure, plan, method or gimmick will legalize state maintained segregation. The constitutional test of a plan is whether it gets rid of segregation in public schools, and does it "now," Green v. New Kent County; Monroe v. Jackson; Alexander v. Holmes County.

4. Good faith of the school authorities if it exists, does not excuse failure to desegregate the schools. " * * * The availability to the Board of other more promising courses of action may indicate a lack of good faith; and at the least *it places a heavy burden upon the Board to explain its preference for an apparently less effective method*." Green v. New Kent County. (Emphasis added.)

5. "Natural boundaries" for school zones are not constitutionally controlling. If a zone encloses a black school in a district like this one where white students are in a heavy (71% white, 29% black) majority, the "naturalness" of the boundary or the existence of reasons for the boundary unrelated to segregation does not excuse the failure to desegregate the school, Keyes v. Denver, Colorado; Henry v. Clarksdale; Clemons v. Hillsboro.

6. It is appropriate for courts to require that school faculties be

desegregated by formula, if necessary, and by a definite time or on a definite schedule, United States v. Montgomery. Faculty assignments so that each school has approximately the same ratio of black teachers as the ratio of black teachers in the school system at large are appropriate and necessary to equalize the quality of instruction in this school system, United States v. Montgomery; United States v. Cook County; Eaton v. New Hanover County (North Carolina).

7. Bus transportation as a means to eliminate segregation results of discrimination may validly be employed, Keyes v. Denver; United States v. School Dist. 151 of Cook County, Illinois, 7 Cir., 404 F.2d 1125, 1130 (1969).

8. Race may be considered in eliminating segregation in a school system, Wanner v. Arlington County, Virginia; United States v. Cook County; Green v. New Kent County.

9. " * * * Whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." Green v. New Kent County; Raney v. Board of Education.

10. The alleged high cost of desegregating schools (which the court does not find to be a fact) would not be a valid legal argument against desegregation, Griffin v. School Board; United States v. Cook County, Illinois.

11. The fact that public opinion may oppose desegregating the schools is no valid argument against doing it, Cooper v. Aaron; Green v. New Kent County; Monroe v. Jackson.

12. Fixed ratios of pupils in particular schools will not be set. If the board in one of its three tries had presented a plan for desegregation, the court would have sought ways to approve variations in pupil ratios. In default of any such plan from the school board, the court will start with the thought, originally advanced in the order of April 23, that efforts should be made to reach a 71–29 ratio in the various schools so that there will be no basis for contending that one school is racially different from the others, but to understand that variations from that norm may be unavoidable.

13. School location and construction and renovation and enlargement affect desegregation. Courts may properly restrain construction and other changes in location or capacity of school properties until a showing is made that such change will promote desegregation rather than frustrate it, Felder v. Harnett County.

14. Where pupils live must not control where they are assigned to school, if some other approach is necessary in order to eliminate racial segregation, Green v. New Kent County; Keyes v. Denver; Eaton v. New Hanover County, North Carolina Board of Education.

15. On the facts in this record and with this background of de jure segregation extending full fifteen years since Brown I, this court is of the opinion that all the black and predominantly black schools in the system are illegally segregated, Green v. New Kent County; Henry v. Clarksdale; United States v. Hinds County.

16. The school board is endowed by Chapter 115, Section 176 of the General Statutes of North Carolina with "full and complete" and "final" authority to assign students to whatever schools the board chooses to assign them. The board may not shift this statutory burden to others. In Green v. New Kent County, the Supreme Court said of "freedom of choice":

> "Rather than foster the dismantling of the dual system the plan has operated simply to burden children and their parents with a responsibility which Brown II placed squarely on the School Board. The Board must * * fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school but just schools."

17. Pairing of grades has been expressly approved by the appellate courts, Green v. New Kent County; Felder v. Harnett County. Pairing, grouping, clustering, and perhaps other methods may and will be considered and used if necessary to desegregate the schools.

18. Some 25,000 out of 84,000 children in this county ride school busses each day, and the number *eligible* for transportation under present rules may be more than 30,000. A transportation system already this massive may be adaptable to effective use in desegregating schools.

19. The school board has a duty to promote acceptance of and compliance with the law. In a concurring opinion in Cooper v. Aaron, 358 U.S. at 26, 78 S.Ct. at 1413–1414 (1958), Justice Frankfurter said:

> *"That the responsibility of those who exercise power in a democratic government is not to reflect inflamed public feeling but to help form its understanding, is especially true when they are confronted with a problem like a racially discriminating public school system.* This is the lesson to be drawn from the heartening experience in ending enforced racial segregation in the public schools in cities with Negro populations of large proportions. Compliance with decisions of this Court, as the constitutional organ of the supreme Law of the Land, has often, throughout our history, depended on active support by state and local authorities. It presupposes such support. To withhold it, and indeed to use political power to try to paralyze the supreme Law, precludes the maintenance of our federal system as we have known and cherished it for one hundred and seventy years. .

> "Lincoln's appeal to 'the better angels of our nature' failed to avert a fratricidal war. But the compassionate wisdom of Lincoln's First and Second Inaugurals bequeathed to the Union, cemented with blood, a moral heritage which, when drawn upon in times of stress and strife, *is sure to find specific ways and means to surmount difficulties that may appear to be insurmountable."* (Emphasis added.)

## ORDER

It is ordered, adjudged and decreed as follows:

1. All facts found in this and previous orders, and all competent evidence including plans, reports and admissions in pleadings in the record are relied upon in support of this order.

2. The November 17 plan entitled "AMENDMENT TO PLAN FOR FURTHER DESEGREGATION OF SCHOOLS" is disapproved.

3. The defendants are directed to desegregate faculties in all the schools effective not later than September 1, 1970, so that the ratio of black teachers to white teachers in each school will be approximately the same as the ratio of black teachers to white teachers in the entire school system.

4. A consultant will be designated by the court to prepare immediately plans and recommendations to the court for desegregation of the schools. The legal and practical considerations outlined in detail in earlier parts of this opinion and order are for his guidance.

5. The defendants are directed to cooperate fully with the consultant. This cooperation will include but not be limited to providing space at the headquarters of the board of education in which he may work; paying all of his fees and expenses; providing stenographic assistance and the help of business machines, draftsmen and computers if requested, along with telephone and other communications services. He shall have full access to maps, drawings, reports, statistics, computer studies, and all information about all phases of the school system which may be necessary to prepare plans or reports. He shall be supplied with any studies and plans and partial plans for desegregation of the schools which the defendants may have. The defendants will provide this consultant with

full professional, technical and other assistance which he may need in familiarizing himself with the school system and the various problems to be solved in desegregating the schools. Any and all members of the board of education who wish to cooperate in the preparation of such a plan may do so. The cooperation of the school administrators and staff will be requested and will be appreciated.

6. Action on the motion of plaintiffs for an order directing immediate desegregation of the entire system is deferred.

7. Further orders with reference to restraining construction and enlargement of schools are deferred.

8. Motion has been filed for a citation of the school board members for contempt of court. Litigants are bound by court orders and may be punished for disobedience of such orders even though such orders may ultimately be reversed on appeal, Walker v. Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). The evidence might very well support such citations. Nevertheless, this is a changing field of law. Despite the peremptory warnings of *New Kent County* and *Holmes County,* strident voices, including those of school board members, still express doubt that the law of those cases applies to Mecklenburg County. This district court claims no infallibility. Contempt proceedings against uncompensated public servants will be avoided if possible. Action on the contempt citation is deferred.

9. If the members of the school board wish to develop plans of their own for desegregation of the schools without delaying or interfering with the work of the consultant, they may proceed to do so, and if they wish any guidance from the court they will find their guidance in the previous opinions and orders of this court and in the court decisions and principles set out in this opinion and order.

10. Jurisdiction is retained for further orders as may be appropriate.