**James E. SWANN et al., Plaintiffs,**

**v.**

**The CHARLOTTE–MECKLENBURG BOARD OF EDUCATION et al., Defendants.**

**No. 1974.**

United States District Court, W. D. North Carolina, Charlotte Division.

June 19, 1973.

Supplemental Opinion Aug. 16, 1973.

J. Levonne Chambers, Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiffs.

William J. Waggoner and William W. Sturges, Weinstein, Sturges, Odom & Bigger, Charlotte, N. C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

### SUMMARY

McMILLAN, District Judge.

This case, now nine years old, was heard again on May 8, 9 and 15, 1973, upon motions for further relief, and upon evidence which presents anew the same collection of questions presented by plaintiffs and intervenors in the summer and fall of 1971. The principal question is whether the racial discrimination, found by the court on October 21, 1971, to be still active and vigorous, has been eliminated from the system, or will be eliminated by the measures now proposed by the defendants. Although much genuine progress is promised by current Board proposals (virtually all of which, for 1973–74, are approved), they do not yet satisfy the constitutional requirements of equal protection of laws (fairness); jurisdiction will be retained for the time being, pending development of some changes in pupil assignment for 1973–74, and the development and implementation of an equitable overall plan for the following years.

### PERTINENT LAW OF THE CASE

In this court's original opinion filed on April 23, 1969, the view was expressed 300 F.Supp. 1358 at page 1371 that:

"[Substantial equalization of the racial proportions in the schools] would tend to eliminate shopping around for schools; all the schools, in the *New Kent County* language, would be 'just schools'; it would make all schools equally 'desirable' or 'undesirable' depending on the point of view; it would equalize the benefits and burdens of desegregation over the whole county instead of leaving them resting largely upon the people of the northern, western and southwestern parts of the county; it would get the Board out of the business of lawsuits and real estate zoning and leave it in the education business; and it would be a tremendous step toward the stability of real estate values in the community and the progress of education of children. Though seemingly radical in nature, if viewed by people who live in totally segregated neighborhoods, it may like surgery be the most conservative solution to the whole problem and the one most likely to produce good education for all at minimum cost."

Later 1969 and 1970 orders, excerpted in 334 F.Supp. 623, 630–631 (1971) provided:

"*December 1, 1969, page 8, ¶15:* 'On the facts in this record and with this background of *de jure* segregation extending full fifteen years since *Brown I*, this court is of the opinion that all the black and predominantly black schools in the system are illegally segregated, Green v. New Kent County; Henry v. Clarksdale; United States v. Hinds County.'

"*February 5, 1970, page 3, ¶5:* 'That no school be operated with an all-black or predominantly black student body.'

"*February 5, 1970, page 4 ¶9:* 'That the defendants maintain a continuing control over the race of children in each school, just as was done for many decades before Brown v. Board of Education, and maintain the racial make-up of each school (including any new and any reopened schools) to prevent any school from becoming racially identifiable.'

"*February 5, 1970, page 4, ¶13:* 'That the Board adopt and implement a continuing program, computerized or otherwise, of assigning pupils and teachers during the school year as well as at the start of each year for the conscious purpose of maintaining each school and each faculty in a condition of desegregation.'

"*Supplementary Findings of Fact dated March 21, 1970, page 10, ¶26:* 'Some 600 or more pupils transfer from one school to another or register for the first time into the system during the course of each month of the typical school year. It is the assignment of these children which is the particular subject of the reference in paragraph 13 of the order to the manner of handling assignments within the school year.'

"*February 5, 1970, pages 4 and 5, ¶16:* 'The duty imposed by the law and by this order is the desegregation of schools and the maintenance of that condition. The *plans* discussed in this order, whether prepared by Board and staff or by outside consultants, such as computer expert, Mr. John W. Weil, or by Dr. John A. Finger, Jr., are *illustrations of means or partial means to that end.* The defendants are encouraged to use their full "know-how" and resources to attain the *results* above described, and thus to achieve the constitutional end by any means at their disposal. The test is not the

method or plan, but the *results.'*" 334 F.Supp. 623, 630–631 (1971).

The Supreme Court of the United States, in Swann v. Charlotte-Mecklenburg, 402 U.S. 1, 91 S.Ct. 1267, 28 L. Ed.2d 554 (April 20, 1971), affirmed prior rulings of this court, in an opinion including language pertinent to the present situation as follows:

"The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation. * * * [S]chool authorities are 'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.' (402 U.S. p. 15, 91 S.Ct. p. 1275)

* * * * * *

"If school authorities fail in their affirmative obligations . . ., judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." (p. 15, 91 S.Ct. p. 1276)

* * * * * *

" 'The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.' Hecht Co. v. Bowles, 321 U.S. 321, 329–330 [64 S.Ct. 587, 592, 88 L.Ed. 754] (1944), cited in Brown II, supra [349 U.S. 249] at 300 [75 S.Ct. 753, at 756, 99 L.Ed. 1083]' " (p. 15, 91 S.Ct. p. 1276)

* * * * * *

". . . The task is to correct, by a balancing of the individual and

collective interests, the condition that offends the Constitution." (p. 16, 91 S.Ct. p. 1276)

\* \* \* \* \* \*

".. . . In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system." (p. 16, 91 S.Ct. p. 1276)

\* \* \* \* \* \*

"The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.

"In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since *Brown*, closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning.' Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with 'neighborhood zoning,' further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy.

"In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight. In devising remedies where legally imposed segregation has been established, it is the responsibility of local authorities and and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system. When necessary district courts should retain jurisdiction to assure that these responsibilities are carried out. Cf. United States v. Board of Public Instruction, 395 F.2d 66 (CA5 1968); Brewer v. School Board, 397 F.2d 37 (CA4 1968)." (pp. 20, 21, 91 S.Ct. pp. 1278, 1279)

\* \* \* \* \* \*

" 'Racially neutral' assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a 'loaded game board,' affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments. In short, an assignment plan is not acceptable

simply because it appears to be neutral." (p. 28, 91 S.Ct. p. 1282)

\* \* \* \* \* \*

". . . It hardly needs stating that the limits on time of travel will vary with many factors, but probably with none more than the age of the students. The reconciliation of competing values in a desegregation case is, of course, a difficult task with many sensitive facets but fundamentally no more so than remedial measures courts of equity have traditionally employed." (p. 31, 91 S.Ct. p. 1283)

\* \* \* \* \* \*

". . . Substance, not semantics, must govern, and we have sought to suggest the nature of limitations without frustrating the appropriate scope of equity." (p. 31, 91 S.Ct. p. 1283)

In June of 1971, following the Supreme Court decision, the defendants proposed to scrap the pupil assignment plan which had been in effect in 1970–71 and which had just been upheld by the Supreme Court, and to substitute a "feeder" plan in its place.

For reasons stated in a memorandum of June 22, 1971, and in an order of June 29, 1971, the proposal was not approved, Swann v. Board of Education, 328 F.Supp. 1346 (W.D.N.C.1971).

That action of this court was affirmed on appeal by the Fourth Circuit Court of Appeals.

The "feeder" plan was resubmitted in revised form to modify some of its grosser constitutional defects; in the hope that defendants would try to comply with the Supreme Court's directives, defendants were authorized to use the "feeder plan" in their pupil assignment program if they wished, provided they nevertheless complied with existing court orders and accomplished the constitutional result, the non-discriminatory operation of the schools on a desegregated basis.

After school opened in 1971, a further hearing was conducted and the plan was reviewed to see how it operated in practice. The testimony at that hearing, and the then situation, were reported in Swann v. Board of Education, 334 F. Supp. 623 (W.D.N.C.1971). The following are excerpts from that opinion:

It is apparent that the feeder plan puts increased burdens of transportation upon black children and upon children in certain low- and middle-income white communities; that it relieves the vast majority of students of the wealthier precincts in southeast Mecklenburg from any assignment or transportation to formerly black schools; and that, compared to these wealthier white people in southeast Mecklenburg, many more of the children of the intervenors are going to formerly black schools. (p. 625)

\* \* \* \* \* \*

The new plan is called a "feeder plan" because each high school draws its pupils from attendance areas of designated junior high schools which, in turn, draw their pupils from attendance areas of designated elementary schools; groups of elementary schools "feed" designated junior highs and the junior highs "feed" designated senior highs.

Educational reasons (in addition to considerations of administrative convenience) advanced for the plan are that it tends to keep children together for their entire school career and promotes the development of group and school spirit and stability and cushions shocks of transfer from one school to another.

These educational arguments for the feeder plan may be subject to question. For example, not all would agree that it is desirable to confine a child's probable school contacts to a particular designated group of students, or to students from particular areas, for twelve years; there is some thought that diversity of acquaintance and exposure enhances education. It was not necessary to change school assignments in order to have most of the effects of a feeder system; children assigned under last year's plan to a particular elementary school could have been "fed" to a particular junior high school and then to a particular senior

high school, regardless of whether they got into the elementary school or the junior high school under a feeder plan, the Finger plan, a "satellite program," or some other plan; the Finger plan itself was in fact a type of feeder plan. Finally, the mobility of American life is such that no plan of assignment based on geographic zoning is really likely to deliver most of the children to the three schools predicted over a period of twelve years. Census reports show that approximately one-fifth of Americans move from one residence to another every year. If Mecklenburgers are as mobile as Americans generally, the average family will move about two times while a child is going through twelve grades. Many if not most of these moves will be to other school attendance zones. Prior evidence in the record shows that in Charlotte-Mecklenburg schools 500 to 600 students a month transfer their residence during the school year from one school zone to another—aside from those who move during the summertime. The suggested benefits of a "feeder" system may therefore be largely unattainable.

As pointed out on June 22, 1971, the feeder plan is unnecessarily expensive because with over 6,400 empty classroom spaces in the schools now open (plus the space available at Second Ward and Irwin Avenue) it contemplates the use of many mobile classroom units. The reduced number of old and new mobile units now proposed (232) is enough to house between 5,800 and 6,960 students; this is a massive program of school building and location which the court is required under the decisions to scrutinize for its possible effects upon the racial make-up of the schools.

The plan is also expensive because, according to the evidence, although the total school enrollment is less this fall, the number of students riding public school busses and City Coach Lines has increased by 7,587 students—from 39,080 under the Finger plan in March of 1971 to 46,667 under the feeder plan in October, 1971.

The use of a feeder plan; the particular pupil assignments; increased bussing; economy of tax money; these are educational and financial matters normally for decision and action by the elected board. The court welcomes the situation in which, for the first time, in all details, the pupil assignments are entirely the work of the local board rather than being, even in theory, the work of court appointed consultants.

Nevertheless, if the feeder system, the revised pupil assignments, or the mobile classroom program causes or restores racial segregation, the Constitution requires appropriate corrective action. If unlawful segregation exists, it is not justified by the existence of educational reasons for acts which produce it.

The essential reason why segregation in public schools is unconstitutional is itself in fact an educational reason—segregated education is inferior education and therefore unequal and discriminatory against the black children.

The principal question now raised about the feeder plan is not the present pupil distribution *per se*; no school is predominantly black, and as of September 15, 1971, the black student populations varied from 10% black at Matthews to 48% black at West Charlotte High. Rather, the principal question is whether the schools will or can remain desegregated under present conditions —whether the plan is likely to be reasonably stable in practice. Historically, schools in this system which have exceeded 50% black have tended to become completely black, and, without court intervention have been allowed to go "all the way." If the plan shows no promise of keeping the schools reasonably stable, the adoption of the plan may as to the formerly black schools be only an exercise in statistics and map-making. If it does show promise of keeping the schools reasonably stable, then we may be approaching the day when unconstitutional discrimination will be ended and the case can be terminated. (pp. 626–627)

\* \* \* \* \* \*

The local, state and federal forces which created segregated schools and which were described in this court's opinions of April 23, and November 7, 1969, and February 5, 1970, have not been shown to have vanished but are in large measure (except for statutes and ordinances which were repealed because they were racially discriminatory on their face) still alive. Residential housing in Charlotte, because of those forces, is still almost totally segregated except in neighborhoods that are shifting from white to black. Reliance on geographic zones for pupil assignments in this context can only lead toward re-segregation in many schools unless the defendants act to prevent it.

In 1969, the school board proposed a partial desegregation plan which, as described by the board, would have transferred about 4,200 children from black schools to white schools. It looked good on paper and was approved by an order of August 15, 1969. See [D.C.] 306 F. Supp. 1291, 1296, 1298. By November, however, it was apparent that the plan had not been carried out according to its advance description and that instead of transferring more than 4,000 black students to formerly white schools it only transferred 1,315; and those 1,315 were, for the most part, put in schools which were about to become predominantly black. See 306 F.Supp. 1302. In the fall of 1970, the defendants put into effect the Finger plan for pupil assignment (the outline of which was devised by a court consultant but the details of which were drafted by the school staff). In the face of the specific court orders which are quoted above, the schools were opened and operated with Berryhill and Barringer, two formerly white schools, predominantly black, and with Amay James still predominantly black. This situation is described in the court's memorandum of October 5, 1970, copy of which is appended hereto. Three other schools, Enderly Park, Hoskins and Wilmore, were allowed to reach or pass the 50% mark during the year.

In addition, several highly specific official actions of the school board itself since the April, 1971 decision of the Supreme Court have added new official pressures which tend to restore segregation in certain schools. These are the construction program (use and location of mobile units); the under-population and proposed closing of formerly black schools; and several recent decisions about pupil assignments and transfers. The current plan contemplates use of 232 mobile units. These units, in the main, are located or scheduled for location at suburban schools remote from the black community. Simultaneously, the formerly black schools, with few exceptions, are being operated at considerably less than capacity. The assignment of mostly low- and middle-income white children to formerly black schools, and the removal of wealthier whites, of which the intervenors complain, is a major element of such recent board action. Another is a series of recent decisions by the board which have allowed numbers of white children to abandon and black students to return to formerly black schools, in violation of existing court orders.

With that history in view, it is necessary to inquire into the board's present plan or program for dealing with foreseeable problems of re-segregation in response to the pressures which have been mentioned in this order. If the board has a program or policy to deal with the results of these pressures, the schools can nevertheless be operated in compliance with the law. If it has no plan, many of the schools are likely to re-segregate.

There is no such plan and no such program.

According to the evidence, the board and school staff assume that various formerly black schools and other schools will turn black under the feeder plan. In the face of that assumption, the board formally voted *not* to adopt a resolution to restrict pupil transfers which would adversely affect the racial makeup of any school. They have made and

allowed transfers which, coupled with changes of residence, have increased the proportions of black pupils at West Charlotte from the 23% proposed in June to 48% on September 15; similar though lesser changes have been allowed in other schools. There is, according to the evidence, no board policy even to consider race in pupil transfers unless a particular transfer or enrollment will result in making a school more than 50% black. (What they would do even in that event is not clear.) There is no policy to restrict transfers which have the cumulative effect of substantially increasing segregation; no policy to learn what children move from one attendance zone to another during the summer, and to take these inevitable changes of residence into account in planning fall pupil assignments; no central method of keeping track of changes of residence during the school year; and no policy to check on "changes of residence" to determine whether such changes are *bona fide* or not. There is also no admitted *practice* of doing any of these things to comply with the orders of court (although it might be inferred from the current statistics that, without admitting to a policy, the staff are being allowed or expected in fact to keep all schools less than 50% black).

It is also apparent that the defendants have misinterpreted the court orders quoted above when they assume that a pupil assignment or transfer will not, within the meaning of the order, "substantially" increase segregation unless the transfer will leave one of the affected schools over 50% black. This interpretation was not revealed to the court until the hearing on September 22, 1971.

The word "substantially" was put into the order to allow the board leeway for use of discretion and common sense, but not to authorize abandonment of control until a school has already become predominantly black.

Racial discrimination through official action has not ended in this school system.

Racial discrimination through official action has not ended when a school board knowingly adopts a plan likely to cause a return to segregated schools and then refuses to guard against such resegregation.

It is therefore apparent that although the current plan *as now working* should be approved, the case will have to be kept active for a while longer. (pp. 627–629)

## WHAT HAS HAPPENED SINCE OCTOBER, 1971.

Following the October 21, 1971, order, this court has attempted to keep "hands off" the schools, in the hope that the self-destructive defects in the feeder plan might be remedied by constructive staff or Board action. The 1971–72 and 1972–73 years passed; schools in most areas reached a condition of relative educational and racial stability; exploratory moves by plaintiffs and by restive north and westside parents to re-open various issues in the summer and fall of 1972 were discouraged by the court, so that at least one summer might pass without major change; the black population at West Charlotte High School hovered near (though discreetly a shade below) the 50% mark; and to judge by press reports, the West Charlotte pupil ratio must have been among education buffs more closely watched than the Dow Jones index.

The petitions of the intervenors from North and West Mecklenburg continued to be substantially denied by the School Board; more importantly, no changes were made for 1972–73 in the practice of giving all black children, in kindergarten and grades one through four, the most and the longest bus rides in the county.

In September, 1972, the defendants appointed a staff committee to re-study and make recommendations on better ways to deal with desegregation problems. The court delayed action further, hoping that this study would produce serious progress. The informative and in-

telligent report of this committee, entitled "Pupil Assignment Study," was apparently completed in March, but was not acted on by the Board until May, 1973, and was never supplied to the court until the May 8-9, 1973 hearing.

At the May 8 hearing, defendants proposed a "bare minimum" or "get-by" group of changes in the plan so as to reduce the black population of several schools below 50%. These changes (except for a slight change in the Idlewild-Lincoln Heights pairing) would have done little to involve the east and south portions of the county in "bussing," and little to stabilize the fluctuating populations of the schools. They would again, as in the rejected 1971 proposal, have reduced West Charlotte to little more than half its maximum capacity, and would have left Harding also greatly under-populated.

At the May 8th hearing the court advised defendants that as a long-run proposition it appeared that a complete revision of the plan, to be effective in 1974-75, should be undertaken, and that as a short-range matter, for 1973-74, some serious changes should be made, including assignments to increase West Charlotte schools to normal enrollment; and that other parts of the county—specifically, the areas whose schools have the lowest proportions of black students —should be the sources of the necessary assignments to the West Charlotte schools.

At a further hearing thereafter, on May 18th, defendants presented some revised proposals.

At the high school level, these proposals included increasing the enrollment at Harding by assigning to it students from Wilmore and Dilworth (fringe areas of the Myers Park High School area), and increasing West Charlotte by transferring children from other north and northeast areas—Statesville Road and Devonshire—from North and Independence to West Charlotte.

At the elementary level, these proposals called for transfer of sixth graders (305 white and 100 black) from three South Mecklenburg schools (Beverly Woods, Olde Providence and Sharon) to three South and West Charlotte schools (Barringer, Enderly Park and Wilmore) which have of late become nearly half black and might now be all black but for earlier orders of this court.

At the junior high level, these proposals called for transfer of a projected 225 white and 70 black students from Alexander Graham Junior High School (Myers Park) to Piedmont Junior High School, another old, inner-city school. (I understand, but have not been informed on the record, that this proposal has now been improved by increasing these assignments to numbers adequate to bring Piedmont up to its approximate capacity; that is a good move.) A shift of students from Alexander Graham to Sedgefield was also proposed. Other proposals, involving the Hidden Valley and Druid Hills areas, were still unsettled at last report.

In the main, these revised proposals appear to be constructive. The assignment of the few hundred additional elementary and junior high children from southeast schools to schools in the older part of town is action of practical as well as symbolic significance; it is a partial breach in the essential insularity of the southeast against "bussing," and it could relieve some crowding at Alexander Graham. The increases proposed in the Harding and West Charlotte populations are of course excellent ideas.

These actions, on the face of it, show increasing recognition of the constitutional necessity and duty under which the court and the defendants operate.

At the same time, recent history and the nature of the current Board actions themselves indicate that much unfairness remains and that although the main branches of discrimination have been pruned, the roots are still thriving.

## SIGNS OF CONTINUING DISCRIMINATION.

█ 1. Black children "are bearing the dominant burden of assignment change and time of transportation both in hours and years." . . . "The plan calls for the extensive assignment of the *youngest* black children out of their home neighborhood for ten (in some cases, all) of their schools years." . . . "The plan calls for more extensive cross bussing for the north and west sides of the city than for any other area. This does not refer to distance alone, but to school-passing routes." "Pupil Assignment Study, pages 13, 14.) Virtually all of the *youngest* black children (kindergarten through fourth grade) are bussed out of their home neighborhoods, often for long distances (while such "bussing" for whites does not usually start until grade five or six). When the public school kindergarten program authorized by the 1973 General Assembly takes effect (starting in 1973 and reaching full swing by 1976 or 1977), the group with the heaviest bussing load will be black *five*-year-olds! This hardly squares with what Chief Justice Burger said in the *Swann* opinion.

2. The feeder plan itself is discriminatory and creates pressures to make West Charlotte and most other westside schools become predominantly black. Charlotte-Mecklenburg is one school district. School districts may not be created by law for the purpose of segregation. The "feeder" plan is nevertheless the creation, by act of the Board, of a new set of "neighborhood" school districts *within* the single Charlotte-Mecklenburg district. The West Charlotte High School zones contain so many black students in proportion to the white students that there was never any realistic possibility that within the West Charlotte "feeder" area there would be enough white students to maintain a white majority at West Charlotte. This is one of the basic facts on which this court's October, 1971, objections to the feeder plan were founded. The staff have been expected to conform any pupil assignment plans to these limitations of the "feeder" plan. Under these limitations, adjustments in the populations of the westside schools would always leave them with a high proportion of black students.

The attached exhibit from the Pupil Assignment Study shows the nature of the problem; the students in communities lying north and west of the Tryon Street—South Boulevard—I-77 axis are 52% to 55% black; those south and east of that line are 6% to 9% black. Two-way transport of children along the numerous traffic arteries that cross that line cannot be avoided if schools are to be stabilized; the "feeder" plan does not provide a lawful excuse for avoiding that two-way transport. Lacking such two-way transport, numerous schools in the West Charlotte and Harding "feeder" areas are steadily threatening to reach, or have reached, black majorities. Examples of "projected" black populations for 1973–74, unless changes are made, are: Druid Hills, 61%; Hidden Valley, 58%; Williams Junior High, 50%; West Charlotte High, 54%; and Ashley Park, 49%; Enderly Park, 47%; Lakeview, 46%.

3. Generally speaking, the formerly black schools are being operated at considerably less than capacity while "white" schools are operated at normal or overcrowded attendance levels. This tacitly proclaims their relative status.

4. The defendants have never passed but have twice rejected (in 1971 and in May, 1973) board resolutions which would direct the school staff to maintain racial stability in the schools as required under the above-quoted court orders.

5. In May of 1973, the defendants adopted a resolution supporting a constitutional amendment to prohibit bussing of children for desegregation purposes. Such action, especially at this juncture, tends to induce people to think or hope that desegregation of public schools will

"go away" and that without "bussing" segregation can be restored.

6. Insistence on an unworkable plan which restores and produces segregation is a continued indicator either of intention to segregate, or lack of appreciation of the seriousness of the constitutional· mandate.

7. Use of mobile classrooms to increase the accomodations at outlying "white" schools, while leaving inner-city and northwest schools underpopulated, is a misuse of building and site locations which can only have the tendency (described above by Chief Justice Burger) to "promote segregated residential patterns" and "further lock the school system into the mold of separation of the races."

8. Six of the ten high school feeder areas, mostly in east and southeast Mecklenburg, continue to enjoy substantial immunity from having children transported to "black" schools. The school principals have reportedly advised the Superintendent that there can be no stable pupil assignment operation until those areas are more fairly involved in the problem; the Pupil Assignment Study (p. 17) advises that "An equitable and stable assignment plan is hardly possible as long as school assignments are based on residence." Busses can economically transport children west as well as east; the distances are about the same. The West Charlotte High School attendance area is broken into five or six scattered zones. The most remote part of these zones is the *northeast* boundary of the county, an airline distance of approximately eleven miles from the school. A ten-mile radius from West Charlotte High School includes North, Garinger, East, Myers Park, Olympic, Harding, and West Mecklenburg High Schools, and reaches within a very short distance of Independence and South High Schools. Distance is not a legitimate factor.

9. West Charlotte, so far as the evidence shows, has competent teachers and staff, and many students have under- gone a very satisfactory educational experience there. This has been against considerable odds, because the evidence strongly suggests that West Charlotte is still thought of by some of defendants as a "black" school and therefore its $3 million plant ought to be closed for conventional high school use as soon as the court will allow it. Some of the circumstances indicating continued discrimination are as follows:

(a) The original and present West Charlotte attendance zones do not contain enough white children to support the assignment of a majority of white students.

(b) The school is not located within any of its various attendance areas. It has no community orientation. This would be of no consequence if pupil assignment problems for other schools were approached with equal pragmatism, but when West Charlotte, formerly black, is the only high school which has this arrangement, it is a point of invidious distinction.

(c) The attendance areas for West Charlotte are six or seven different fragments which either do not touch each other or touch only at narrow points or corridors. The "feeder" theory of a community of common interests is totally lacking.

(d) West Charlotte has a normal "capacity" of 1603 students (and in 1969–70, when it was 100% black, it had 1641 students and was considered adequate for 1912 students). In the original rejected 1971 feeder plan, defendants proposed to cut its population to only 940 students; since 1971 it has been operated at approximately two-thirds of its capacity. The original 1973–74 proposal called for a reduction to a "projected" 975 students —a startling resubmission of the rejected 1971 plan for 940 students! Of the other nine high schools all except Harding (783) are operated at or far above capacity and have student bodies varying from 1161 (West Mecklenburg) to 2292 (East Mecklenburg).

Educators may well differ on the optimum size for a high school; but in this district, under Mecklenburg folklore, a small high school is inferior to the larger schools. For example:

(1) A small school is unable to compete (except in basketball) in the AAAA sports league with other county high schools, which range up to 2292 students; school spirit and unity are thereby adversely affected.

(2) Small population cuts down on the academic courses available; a small population does not generate the same demand for courses like advanced mathematics and science and classic languages. Under the complexities of teacher assignment and financing, the result has been that in a smaller high school it is difficult to get the same courses for serious high school or college preparatory work that other, bigger high schools have. This is coupled with a device called the "academic transfer," which allows a pupil to transfer from a school with incomplete curriculum to a school which offers desired courses. This inevitably tends to distinguish the smaller school as academically inferior.

(e) From the beginning of the desegregation program the student population of West Charlotte has been maintained in an atmosphere of "brinkmanship"; the school each summer is "projected" to have a proposed black population; somehow, many of the whites "projected" to be assigned do not arrive or are allowed to transfer, and the school population hovers throughout the year at or close to the 50% mark. In Mecklenburg County, at this stage of desegregation, this produces an unstable and impermanent atmosphere.

(f) At West Charlotte for several years the football stadium has not been allowed to be used for inter-scholastic football games, and the lights have not been allowed to be turned on at the practice field! The reasons given (fear of disorder and rotten light poles) are not adequate nor accepted.

(g) As recently as May 1, 1973, the Board declined to take action on a proposed policy to improve West Charlotte's academic situation by maintaining its teacher complement and offering a full quota of academic courses.

(h) When asked why West Charlotte is kept under-populated since its desegregation, an assistant superintendent testified there are no educational nor administrative reasons for keeping West Charlotte small and there are various administrative and educational reasons against operating other high schools in their present badly over-crowded condition; a Board member testified that race was the only reason for keeping West Charlotte's enrollment low; and there was other testimony that West Charlotte would be operated at normal capacity if *it were not a "black" school.* I find these statements to be correct. Inferences to the same effect may be fairly drawn about the under-population of other formerly or recently black schools.

10. *Harding High School* is on the west side of Charlotte and its attendance area includes several neighborhoods which have changed or are changing from white towards black. Under-populating Harding, as the original 1973 plan proposed, produces the same unfavorable side effects as those described for West Charlotte (although since Harding has never been considered as "black," assignments to Harding have not produced the same reaction as assignments to West Charlotte).

11. *Double Oaks.* In June, 1971, the Board announced a plan to close Double Oaks Elementary School because (like many "black" schools) it sits on a dead-end street in a black community and the defendants considered it to be no place to which busses should be driven. During the 1971 hearing, it developed that the School Board has a right-of-way

over (or owns) an unimproved street which leads directly east a block or so from the school property into Statesville Road. If improved with gravel or pavement grading this right-of-way, already passable by automobile, could open up the bottleneck. Specific mention of this was made in the court's June 29, 1971 order.

In the course of the May, 1973, hearing, it developed that this road or driveway has not *yet* been improved and that school busses therefore do not use it! The only explanation given—that the city wouldn't improve the street unless they have a sixty-foot right-of-way, and that the school authorities would like to do something about it but find their hands tied—does not seem to hold water. No $80,000,000 budget is so powerless. The road should be either paved or graveled so that there will be drive-through access to the Double Oaks School. If this is done, the school will be much closer to traffic arteries and more accessible.

The Double Oaks library suffered a fire some years ago and is not, even yet, according to the evidence, up to city standards for fifth and sixth graders.

12. Defendants proposed to increase the West Charlotte student body by transferring to West Charlotte 180 white and 100 black students from the Statesville Road (North High School) area and 350 white and 125 black students from the Devonshire (Independence High School) area. This would add one unconnected and one barely connected new area to the West Charlotte feeder area. These changes would restore West Charlotte to full size and, if accompanied by the restoration of full academic and extra-curricular programs and staff, could for the time being solve the problems of underpopulation mentioned above.

The problem with the proposal is not with its numerical results, but with its fairness and stability.

North Mecklenburg is where desegregation began; Statesville Road is part of the north area; the people of North Mecklenburg, black and white, have "done their bit" since long before the original 1969 order; north area schools are educationally stable, and have operated with minimum friction.

Devonshire is a suburban area between eight and eleven road miles (depending on the route chosen and the state of interstate highway construction) east of West Charlotte High School. It is located northeast of Charlotte and two or three miles (that is, the width of the Briarwood community) east of Hidden Valley.

The pertinent history of Hidden Valley includes the facts that a few black families moved into Hidden Valley several years ago; thereafter, starting in 1970, as school children from Hidden Valley were assigned to formerly black schools including West Charlotte, white families began moving out of the community at an increasing rate and their children were allowed without substantial restraint to transfer away from West Charlotte High School. The community has acquired a substantial black population. Hidden Valley is cited as an example of the kind of traumatic influence which "spot zoning" by school boards on pupil assignments can have upon a residential neighborhood.

Whether that influence is good or bad may be debatable; real estate agents and sociologists might disagree; the pertinent fact is that the exodus of white students from Hidden Valley and Tryon Hills has played a large part in the difficulty of maintaining the student population at West Charlotte. Meanwhile, land values and real estate developments in "no-bussing" areas in the east and south are growing rapidly.

Devonshire is, in many respects, a community quite similar to Hidden Valley. Its residents are people generally without extremes of wealth. A few black families have begun to move into the area. The School Board's proposal to transfer *all* * the high school students from the Devonshire area to West Char-

* (later modified to exclude seniors from the transfer).

lotte has already had its predictable effect of upsetting the Devonshire community and putting a lot more houses on the market for sale.

Some of the high school students in the Devonshire area would spend each of their three high school years in a different school because of this change in their school assignments.

The "domino effect" of the assignments to West Charlotte of all the Devonshire high school students, hard on the heels of the experience of Hidden Valley, is apparent.

The sore spot may not really be the assignment to a school eight or ten miles away (high school students usually have to travel quite a ways to school); nor, it is to be hoped, is it the educational shortcomings of West Charlotte; West Charlotte is not expected to suffer any deficiency of academic offerings nor extra-curricular activities in the future. Rather, the sore spot with the people of Devonshire and elsewhere in the Garinger—North—West Charlotte—Harding area is that people in the southeast part of the county, including many who live closer to West Charlotte High School than Devonshire, are not being required to attend a "black" school at any time during their high school career (nor, as a practical matter, for more than a year or two at any stage of their education). If the assignments were done in fairness instead of in such a way that they effectively re-zone real estate and drastically affect land values, most, but of course not all of the valid objections would be reduced or eliminated.

Significantly, the Pupil Assignment Study (p. 10) reports that "the assignment plan has had greater and more immediate effect on housing in Charlotte than on the schools."

A fair plan would not have such effects.

13. *The "leap-frog" problem.* The pupil assignment plan has a fundamental, built-in impediment, which makes all desegregation efforts more difficult and inconvenient than need be. This is the creation, as the first step in desegregation, mostly within the near reaches of the south and east part of the district, of walk-in schools, before dealing with problems of desegregating outlying schools. These walk-in schools tend to absorb the black students who live in the central and south parts of the city. Desegregation of east and southeast white schools and northwest black schools can then be accomplished only by a "leap-frog" operation, transporting children long distances *across* the center of the city, instead of shorter distances along radii *into* and *out of* the center of the city. The transportation of Lincoln Heights black first graders twelve or thirteen miles to Idlewild, and the proposed transportation of Idlewild children longer distances to Lincoln Heights, are typical results of this arrangement. The feeder plan's reduction in two-way bussing aggravates that problem. The inconveniences of desegregation to northwest blacks and to east and southeast whites (*and thus their foreseeable opposition to it*) have been thereby increased. Some approaches more imaginative and less hidebound need to be attempted.

14. Until now, defendants had taken no initiative whatever in coping with problems of desegregation; their actions have awaited court orders or instructions, and have been based on minimum interpretation of what compliance would require. The current proposals as to Harding High School and Piedmont Junior High may be exceptions to this tradition. Although the combination of Piedmont Junior High and Eastover students from Alexander Graham Junior High may compound the "leap-frog" problem described in the preceding paragraph 13, I accept it and the Harding changes as intended and significant departures from the traditional policy of resistance.

▪ ▪ ▪ ▪ ▪ ▪

■ It may be that some of the continuing discrimination is unintended or

accidental; some of it may be the result of inertia and the instinctive habits of centuries-old duration; some Board members, no doubt, are unaware of much of it. As a constitutional matter, however, it does not seem to make much difference whether discrimination is the consciously intended result; responsible public servants, like the mythical "reasonable man" of the law, may be presumed to intend the natural and probable consequences of their actions and defaults; if conscious policies and actions produce or restore segregation, or have the effect of labeling a school as "inferior," those policies are discriminatory and must be corrected.

## LEVAVI OCULOS

Astronomy lagged as long as political and religious authorities continued to insist that the sun and stars revolved around the earth.

Mecklenburg lags in achieving a "unitary" school system as long as defendants insist that pupil assignments to prevent segregation must revolve around the "feeder" plan.

Like the earth-centered universe, the feeder restrictions make progress impossible. If its restrictions are ignored (as they must be; no such post-*Swann* school re-zoning can be permitted to re-segregate schools), all kinds of constructive action becomes possible. The entire school community, rather than one selected segment of it, can become involved in the solution of this ancient problem.

The story (apocryphal, no doubt) is told of the field commander whose aide came to him in panic because the enemy had been unexpectedly reported at a spot just an inch away on his chart. Knowing the country, the commander re-assured his aide, telling him the situation was well in hand and there was plenty of time to prepare because the enemy that looked so close was really a day's march away.

"What you need," he said, "is a larger map."

What the pupil assignment people in this county need is a larger map—one that includes the whole county rather than restricted parts of it.

Six of the nine members of the Board and numerous key staff members live in the "no bussing" country in the east and southeast parts of the county. With peripheral exceptions only, white children from that area have not been "bussed" to formerly black schools. Members of the Board and staff have expressed doubt that people from east and southeast Mecklenburg will attend "black" schools. This may be. A parent has the right to send his child to a private school and a student of competent age may quit school if he chooses. Private education, unlike *public* education, is a private thing. Those who drop out of public school to attend private school are far outnumbered by those who drop out for other reasons. Public education should be more concerned about salvaging those who drop out for economic or academic reasons than about those who drop out to attend private schools.

The most significant flaw, however, in the reasons given for the discrimination in favor of the south and east is the apparent assumption that the people who live in south and east Mecklenburg are more self-centered or racially intolerant than the people who are already experiencing "bussing."

I can not and will not make such a gloomy and defeatist and uncomplimentary presumption about such a large number of progressive citizens. It seems to me that to the extent required by fairness, south and east Mecklenburgers will be as tolerant of measures necessary to desegregate public schools as others have been. The excellent response which people from those areas have made to the limited assignments of their children to First Ward, Bruns Avenue and Billingsville (and now to Piedmont Junior High) is, I consider, a more reliable token than the fears of the doomsayers and the threats of a few intolerants.

■ Even though *perfect* fairness in desegregating schools may still be impossible, fairness is still the prime guide of a court of equity; and *gross unfairness*, such as still exists in the current situation, is the legitimate target of a court of equity which was originally called to act because of the unfairness (lack of equal protection of laws) in the operation of the schools.

## ORDER

Based on the foregoing, and on all pertinent findings of fact and legal principles from former orders which support these conclusions, it is ordered, adjudged and decreed:

1. That the previous orders of this court affecting desegregation of schools remain in effect and be followed by defendants.

2. That defendants refrain from giving any effect to the "feeder" plan, or any other re-zoning plan, which in any way restricts or handicaps the assignment of pupils as necessary to comply with previous orders and with this order.

3. For the year 1973–74, time is too short to effect the major improvements in the theory and practice of pupil assignment which are necessary for reasonable stability of the desegregation plan. Therefore, to the extent that the incomplete plans for 1973–74 are described in the part of this order entitled "WHAT HAS HAPPENED SINCE 1971," those plans are approved for the 1973–74 year, provided they comply in results with previous orders, and with the following specific exceptions:

(a) The assignment of students from only Devonshire and Statesville Road areas to West Charlotte High School to restore its student population to full capacity is not approved; defendants are directed to prepare a revised plan which will assign these additional students, in a fair and equitable manner, from the basic attendance areas of those crowded high schools (Garinger, East, Independence, Myers Park, South and Olympic)

which in 1972–73 had the lowest proportions of black students. Various methods are available for making such assignments, including, for example, random selection by name, by block, by census tract or other small area; blind lottery; by selecting a specific area within each basic high school attendance zone; by nomination of principals; or any other fair method. If I were doing the job I would not transfer any seniors and I would transfer about equal numbers of sophomores and juniors. It also (with schools like Hidden Valley, Berryhill and Ashley Park in mind) is inadvisable to select any one neighborhood as the source of these students from any given high school feeder area, unless defendants are interested in staying in the business of re-zoning real estate. Defendants are directed to submit their proposed plan by July 2, 1973.

(b) Plans affecting Druid Hills and Hidden Valley areas are unknown to me and are understood to be unsettled.

(c) West Charlotte High School athletic facilities, for practice and for inter-school competition, shall be restored immediately to full use and made as fully available as those of any other high school in the county.

(d) West Charlotte and Harding, starting in September, 1973, shall provide all academic courses, at the school, for all pupils who request them, that are made available at any other high school in the county.

(e) The defendants are directed to report to the court, by July 2, 1973, the condition of the physical plant at Double Oaks and their specific plan and schedule for opening up the dead-end traffic situation at Double Oaks and the restoration of its library to adequate status.

4. For 1974–75 and following years, defendants are directed to prepare a new plan for pupil assignment and desegregated school operation. Insofar as the feeder plan limits options, it must be disregarded. The plan should be drawn on the premise that equal protection of laws is here to stay.

Defendants are requested to submit by September 4, 1973, a report showing the organization that has been formed to devise such plan, and a timetable for action which will produce a final plan before March 1, 1974.

Exhibit
(Referred to on page 1232)

CHARLOTTE–MECKLENBURG SCHOOLS

Proportion of Black Students By Residence, October 1, 1972

## SUPPLEMENTAL OPINION

On June 19, 1973, an order was entered, for reasons stated, requiring, among other remedial measures, that defendants assign white students to West Charlotte High School to restore it to approximately its capacity. The order provided that instead of selecting students for this purpose from only Devonshire and Statesville Road the defendants should prepare a revised plan which would:

". . . assign these additional students, in a fair and equitable manner, from the basic attendance areas of those crowded high schools (Garinger, East, Independence, Myers Park, South and Olympic) which in 1972–73 had the lowest proportions of black students. Various methods are available for making such assignments, including, for example, random selection by name, by block, by census tract or other small area; blind lottery; by selecting a specific area within each basic high school attendance zone; by nomination of principals; or any other fair method. If I were doing the job I would not transfer any seniors and I would transfer about equal numbers of sophomores and juniors. It also (with schools like Hidden Valley, Berryhill and Ashley Park in mind) is inadvisable to select any one neighborhood as the source of these students from any given high school feeder area, unless defendants are interested in staying in the business of re-zoning real estate."

██ The school staff drew up various possible plans for making these assignments and the board met and adopted a plan which was described and made the subject of testimony at a further hearing on July 26, 1973. The court orally approved that plan, and this order (supplemented by the additional provision inserted in numbered paragraph 1 to stabilize the implementation of the plan) is a confirmation of that oral ruling.

In brief outline, the plan will assign six hundred students from the six named northeast, east, south and southwest high school areas, giving West Charlotte a "projected" total population of 1,725 (35% black); the numbers of students chosen from each high school area were determined upon the basis of the extent of the over-population of the six schools; generally speaking, areas from which there had been no "bussing" at all were the first areas from which students were assigned; the areas actually chosen for assignment of students are "cells" approximately one-half mile square; and a lottery was conducted to select the cells whose tenth and eleventh grade students are to be assigned. There were other refinements to which no exception is taken.

The staff work done on this plan appears to be of a high order. It is true that the plan is not the only fair one that could have been devised; it still leaves large areas of the county with no involvement in "bussing"; and it operates upon some premises which might not have been adopted as matters of choice by another group nor by any given school patron. Nevertheless, in theory and on paper it is a fair plan and I think it was intended to be fair; and as a preliminary method of choosing the students to be assigned for the forthcoming year this plan is approved. I am grateful to the various staff people who worked on this project, and to Mr. John Smith who so clearly and intelligently explained it in court.

The existence of the plan and the making of the assignments do not without more bring about the establishment of a stable desegregation. At its July 16, 1973 meeting the board rejected a resolution that once an assignment has been made to West Charlotte, this assignment should stand even if the student moves from the assignment area. This resolution represents at least the third instance in which by formal vote the school board has refused to take steps to comply with the order of this court, first made on February 5, 1970 (334 F.Supp. 623, 630–31):

"*February 5, 1970, page 4,* ¶ *9:* 'That the defendants maintain a continuing control over the race of children in each school, just as was done for many decades before Brown v.

Board of Education, and maintain the racial make-up of each school (including any new and any reopened schools) to prevent any school from becoming racially identifiable.'

"*February 5, 1970, page 4, ¶ 13*: 'That the Board adopt and implement a continuing program, computerized or otherwise, of assigning pupils and teachers during the school year as well as at the start of each year for the conscious purpose of maintaining each school and each faculty in a condition of desegregation.'

"*Supplementary Findings of Fact dated March 21, 1970, page 10, ¶ 26*: 'Some 600 or more pupils transfer from one school to another or register for the first time into the system during the course of each month of the typical school year. It is the assignment of these children which is the particular subject of the reference in paragraph 13 of the order to the manner of handling assignments within the school year.' "

In the June 19, 1973 order, the court expressed the view that "It seems to me that to the extent required by fairness, south and east Mecklenburgers will be as tolerant of measures necessary to desegregate public schools as others have been." The accuracy of that view of course has yet to be determined. If the defendants continue to consider that their obligation is satisfied by making the assignments, and if any considerable numbers of students take steps to evade their assignments, we might end up in September with West Charlotte High School again under-populated, and continuing to be thought of as a "black" school, and with Harding facing similar problems of lesser degree. In default of any action by the board to cope with those contingencies, which some board members have predicted, further action by the court appears necessary if the experiences of 1971 and 1972, fully described in previous orders, are to be avoided.

With regard to the improvements in the Double Oaks library and the drive-way access to Statesville Avenue, the defendants reported at the hearing that these matters were proceeding as directed in the June 19, 1973 order.

With regard to the restoration of the West Charlotte High School faculty and athletic plant, the court was advised at the hearing that those matters are proceeding as directed in the June 19, 1973 order.

As to the rezoning of portions of Hidden Valley and Newell for pupil assignment purposes, the court does not find in those actions any unfairness of such magnitude as to require the intervention of this court; if board members have any doubts themselves about the Hidden Valley—Newell assignments, they may desire to reconsider that problem.

As to kindergartens, there has been no evidence taken and the court has little information on the subject. The kindergarten program is included in the general order of June 19, 1973, calling for a restudy and replanning of pupil assignments and the development of a stable and permanent plan starting in 1974. I do not think there is time for adequate separate consideration of the kindergarten problem before school opens, and ruling on that matter should be postponed until the overall study and planning have been done.

Based upon the foregoing considerations, and upon the exhibits and other relevant evidence in the record, it is therefore ordered:

1. The method proposed by defendants for the initial choice of students for attendance at West Charlotte High School and Harding High School is approved. However, since defendants have again defaulted in their obligation by formally declining to make the West Charlotte assignments permanent, even for the 1973–74 school year, some action must be taken to remedy and prevent the unnecessary uncertainty and instability which that continuing default threatens; and therefore, until such time as defendants turn their attention to the problem and prepare and receive court approval

of a better plan of their own, defendants are directed not to permit a student who has been thus selected for, or whose neighborhood has been zoned for attendance at, West Charlotte or Harding to enroll in or attend any other public school in the system unless simultaneously they transfer to West Charlotte or Harding, as the case may be, a white student to take his or her place. Students found by the board to have genuine medical or disability problems requiring special transportation facilities or prompt access to medical attention may be exempted from this order. The selection of such replacement student shall be made, by such fair method as the board may choose to follow, from white tenth and eleventh grade students in the same high school attendance area as the student originally assigned to West Charlotte or Harding, and from a cell in said area which the staff has heretofore classified as a "zero bussing" cell. Residence of a student within a particular cell or school attendance area shall be taken as the *bona fide* residence (as of June 19, 1973, the date of this court's last previous order) of his parents, or of his legal guardian if he had no parents, or of the student if he or she was self-supporting. The defendants are free to propose a different method of dealing with the stability problem if they wish, and the court will endeavor to pass immediately upon any such proposal.

2. It appears that proper steps are being taken to deal with matters specifically directed in the previous order with reference to the West Charlotte faculty, physical plant and athletic program, and with regard to the Double Oaks plant, access and library. As to curriculum at West Charlotte and Harding, there is not enough information yet available to make a comment.

3. Ruling on matters respecting public kindergartens is deferred.

4. No order is made with reference to matters involving assignments to Hidden Valley and Newell.

5. The defendants have reported the prospective attendance situation as of August 15, 1973, and they are requested to report as of approximately September 4, 1973, concerning the probable and actual enrollments and attendance at West Charlotte High and Harding High, based on the data then available.

6. Defendants are requested to advise the court about the middle of September and at a convenient reporting date in October as to the attendance, by school and race, at all the schools in the system, and to continue these reports monthly thereafter until such time as it appears that the reports are producing or will produce nothing of material significance.

7. Upon informal request of the defendants, the date for the preliminary report on the permanent overall plan for 1974–75 and thereafter is extended from September 4 to September 12, 1973.